[No. 21515. Department One. April 23, 1929.]

BLANCHARD LUMBER COMPANY et al., Respondents, v. LUCKENBACH STEAMSHIP COMPANY, INCORPORATED, Appellant.[1]

John S. Robinson, for appellant.

Douglas T. Ballinger and Harry Ballinger, for respondents.

TOLMAN, J.—This is an action to recover for loss of property delivered to a common carrier for shipment by water. The action was tried to the court, sitting without a jury, resulting in findings favorable to plaintiffs and a judgment as prayed for. The defendant has appealed from the judgment.

Respondents, through their brokers, entered into what is called a space contract for the shipment of certain lumber at certain designated rates on the steamship Katrina Luckenbach from Everett, Wash-

[1]Reported in 276 Pac. 535.

ington, to Atlantic coast ports, the vessel to be in port to receive the shipment April 4 to April 9, 1927. The contract, among other things, provides:

"Shipments covered by this contract are to be delivered to ship's tackle as fast as ship can load—night or day, Sundays or holidays—at the option of the carrier."

And, also,

". . . . and subject also to all terms and conditions of carrier's current bill of lading."

On notice from the carrier, the lumber was so delivered alongside the ship, loaded in the usual and customary way on a scow known as Pacific No. 7, which appears to have been in good condition and entirely seaworthy. The trial court found:

"That said lumber was delivered at ship's side on Barge, 'Pacific No. 7,' April 6, 1927. The Katrina Luckenbach was berthed on the south side of Pier 3, Everett, port side towards the dock and at 2:30 p. m. there were three loaded barges on its offshore side. At said time Pacific No. 7 was by orders of defendant brought alongside, it was towed by Pacific Tow Boat Company's Diesel tug Sea Imp 2 to the forward end of second scow from the forward end. The barge was placed parallel to the ship and made fast with the ship's hawsers under the directions of defendant's stevedores and agents.

"That, in the early evening of said day a southwest wind sprang up, blowing directly against said scows and exposing them to heavy seas running during said storm. The position of said barge, 'Pacific No. 7' changed slightly and it pounded heavily against the ship's side and scows moored at either end. This caused 'Pacific No. 7's' seams to open and she took water. It also caused the lumber to shift towards the ship. The hawser broke and additional lines later made fast from the ship to the off shore side of the barge caused it to dump part of its load at approximately one a. m. This threw the lumber overboard towards the ship.

"That defendants were negligent in failing to properly secure said scow with cables of adequate strength placed at either end thereof, although the danger from wind and waves was apparent; were negligent in failing to remove said scow to a sheltered place although there was a safe place close by, and tugs at all times available to remove it.

"That by reason of defendant's negligence as aforesaid, a large portion of plaintiffs' Blanchard Lumber Company's lumber was lost overboard, whereupon it became necessary to employ salvors to recover the same, for which plaintiff paid the reasonable sum of $865.46.

"That plaintiff's lumber was salvaged with the exception of 32,513 board feet of the market value of $643.38.

"That, by reason of defendant's negligence as aforesaid, a large portion of plaintiffs' Woodstock Lumber Company's lumber was lost overboard, whereupon it became necessary to employ salvors to recover same, for which plaintiff paid the reasonable sum of $30.66.

"That plaintiff's lumber was salvaged with the exception of 5,875 board feet of the market value of $123.38."

The testimony is very conflicting and, upon some features of the court's finding, is very nearly equally balanced, but, upon what we consider the essential and controlling finding of a failure to remove the scow to a safe and sheltered place after the condition of the weather had so far developed as to make such a course prudent, we are abundantly satisfied that the evidence is ample. Under our well settled rule, that finding must be sustained. The finding of negligence in that respect is sufficient to entitle respondents to recover, and we need pursue the inquiry no further.

There is left for consideration only the question raised as to the amount of the recovery.

As we have seen, the space contract is made subject to the terms of the carrier's current bill of lading.

The current bill of lading, though not issued when the loss occurred, is nevertheless by agreement of the parties made controlling. The carrier's current bill of lading provides:

"The carrier shall not be liable for: . . .

"Loss and damage exceeding the actual pecuniary loss or damage sustained by the shipper, consignee or owner of the goods, but in no case shall the carrier be held liable for any profits or increase of price or value over invoice cost, and not exceeding said invoice cost, or for any consequential or special damage, in any case liability shall not exceed $500 for one whole package, or proportionate amount for any part thereof, unless the value when exceeding this amount is mutually agreed to in writing at the time of delivery of shipment and is stated in this bill of lading, and extra freight paid thereon as per tariff."

Respondents offered testimony fixing the amount of their damages as the insurable value of the lumber lost, which was $31 per M., less $11.29 per M., as prepaid freight returned, and asked, and were by the trial court allowed, a recovery on the basis of $19.71 per M., the difference between the insurable value and the freight. Respondents' witness, on this subject, when asked as to how he arrived at the values, testified:

"A. Yes. There are two ways of arriving at it. There is the price to the mill, f. a. s., and then there is a price that includes the insurable profit. Q. Yes. Now, which of those are you giving? A. It is so long since I have worked on this I am not quite familiar with it. In just a moment I can tell you. The insurable value. Q. The insurable value? A. Yes sir. In other words, our people are entitled to their profit on the lumber that is lost, which is customary in all matters of this sort. Q. So this figure you have given on the loss here is a figure which includes the profit they would be expected to make on this lumber? A. Correct. That profit is limited—definitely limited, I think. Q. Do you know, Mr. Brady, what the invoice

cost of the lumber was? A. Sixteen dollars. Q. Sixteen dollars a thousand? A. Yes sir; the mill value of the lumber f. a. s."

Since the mill placed the lumber alongside the ship for $16 per M., we think, under the terms of the bill of lading, the loss must be computed on that basis.

The judgment must be modified, therefore, by the deduction of $3.71 per M., upon the lumber lost. In all other respects, it will stand affirmed.

Remanded with directions to modify the judgment as herein indicated.

MITCHELL, C. J., HOLCOMB, FULLERTON, and BEALS, JJ., concur.